**FEDERAL DEPOSIT INSURANCE CORPORATION**

v.

Peter E. DUFFY, et al.

Civ. A. No. 89–4947.

United States District Court, E.D. Louisiana.

Oct. 27, 1993.

James C. Gulotta, Jr., Phillip A. Wittmann, Stone, Pigman, Walther, Wittmann & Hutchinson, Charles Louis Stern, Jr., Steeg & O'Connor, New Orleans, LA, for plaintiff.

John Villars Baus, Jr., Hammett & Baus, New Orleans, LA, for defendant.

## ORDER AND REASONS

CHARLES SCHWARTZ, Jr., District Judge.

This matter is before the Court on defendant New England Insurance Company's ("New England's") Motion For Summary Judgment seeking dismissal of the FDIC's claims herein for coverage under its claims made professional liability policy issued to John Mmahat ("Mmahat"), the law firm of Mmahat and Duffy ("M & D"), and Peter E. Duffy ("Duffy") as a partner of the firm of M & D. The Federal Deposit Insurance Corporation ("FDIC") has formally opposed the New England's motion. The matter was set for oral hearing on Wednesday, October 13, 1993, but was submitted on the briefs. Based upon the record herein, the submissions of the parties and the governing law, and for the reasons stated herein below, the Court grants the New England's Motion for Summary Judgment.

I. FACTUAL AND PROCEDURAL HISTORY

This proceeding was instituted by the FDIC on November 11, 1989, the FDIC as manager of the *Federal Savings & Loan Insurance Corporation* ("FSLIC") Resolution Fund and successor to the FSLIC, filed the instant complaint against Peter E. Duffy ("Duffy")[1] and the New England Insurance Company ("the New England"). *Via* the present suit against the New England, the

---

1. On April 17, 1990 Duffy received a discharge in bankruptcy, which relieved him of any potential liability for his virile share of the *Mmahat* Judgment. Hence the sole defendant remaining in this proceeding is Duffy's alleged insurer, the New England.

FDIC seeks to recover Duffy's virile share of a pre-existing $35 million dollar judgment against John Mmahat and M & D rendered by this Court against John Mmahat and M & D in a suit entitled *Federal Deposit Insurance Corporation (FDIC) v. Mmahat,* 907 F.2d 546 (5th Cir.1990), *cert. denied,* 499 U.S. 936, 111 S.Ct. 1387, 113 L.Ed.2d 444 (1991).

The earlier *Mmahat* proceeding was instituted by the FSLIC on November 21, 1986. In its initial complaint the FSLIC sued Mmahat (i.e., a partner in M & D and general counsel for Gulf Federal Savings and Loan) for malpractice [2] in advising Gulf Federal on a regular basis to make loans in violation of the LOTB ("loans to one borrower") regulations, even after warnings by Federal Home Loan Bank Board (the "FHLBB"). On January 20, 1988, the FSLIC filed its Third Amended Complaint in the *Mmahat* case naming the New England Insurance Company as an additional defendant. The evidence at the trial of the *Mmahat* matter showed that Mmahat had encouraged the loans so that his law firm could make fees on the closings.[3] The jury found that Mmahat and his law firm M & D breached their fiduciary duty owed to Gulf Federal and awarded damages of $35 million.[4]

The Fifth Circuit most accurately summarized the *Mmahat* proceedings, as follows:

[T]he *Mmahat* case was divided into two parts. Phase I included the suit against M & D and Mmahat, individually, and the New England Insurance Company (New England), their professional liability insurer, for legal malpractice and breach of fiduciary duty. The professional malpractice action rested on the claim that Mmahat had repeatedly advised Gulf Federal to make loans in violation of the "loans-to-one-borrower" restrictions of the Federal Home Loan Bank Board. Phase II consisted of malpractice claims relating to three loan transactions in which Mmahat made defective title examinations and other errors. The Phase I case culminated in a jury verdict of $35 million against Mmahat and M & D.

After the verdict was returned, but before the district court determined whether the partnership's insurance policy covered the verdict, counsel announced a settlement on the Mmahat Phase II claims. Counsel for the FSLIC dictated the terms of the settlement on the record. The settlement covered the Phase II claims for malpractice. The parties also reserved their rights and defenses in connection with the jury verdict and any judgments rendered in the Phase I claim. New England specifically reserved its right to contest *both coverage and policy limitations* on both phases of the lawsuit and how payments of the Phase II settlement would be credited against the policy limitations. The FDIC reserved the right to oppose.

---

**2.** It is undisputed that acts of Mmahat and the firm constitute legal malpractice, despite FDIC attempt to argue to the opposite effect. In the *Mmahat* case, this Court's Order and Reasons entered December 28, 1988 (New England Exhibit "2") states its findings with regard to the dishonest acts of Mmahat and the M & D firm as follows:

[T]he Court finds Mmahat's dishonesty as director was an integral part of his dishonesty as a lawyer: He clearly used his position on the board in furtherance of his legal business to an extent beyond any legally acceptable point. This evidence, in conjunction with the jury verdict, leads to the inescapable conclusion that Mmahat attempted to gain personal profit and advantage to which he was not legally entitled, using his position as an attorney and as a board member, and that he was dishonest in doing so....

Because Mmahat's liability herein arises in the context of his dual role as director and

attorney for Gulf, the Court also questions whether the loss at issue arises "solely" from his capacity of director. From the size of the verdict, it is apparent the jury found the full extent of the losses here at issue attributable to the actions of Mmahat and the law firm as attorneys. Thus, the losses here at issue cannot be said to have arisen solely from Mmahat's actions as director.

**3.** The FDIC's evidentiary presentation at trial centered around alleged faulty LTOB advice on large commercial loans, all made between 1982 and mid–1985.

**4.** The $35 million represents seven specific loans that were made in violation of the LTOB restrictions, and whose default contribute to the collapse of Gulf Federal. *FDIC v. Mmahat,* 907 F.2d 546, 549 n. 3 (5th Cir.1990). The seven loans were made prior to November 1985.

When these terms were recorded, the district court then asked if the settlement affected anyone else. Michael Ellis, co-counsel for Mmahat and M & D, announced that Duffy concurred.[5]

The insurance coverage issues were reserved for this Court's ruling, which issued on December 28, 1988 (i.e., after the parties settled the Phase II claims). This Court found that both Mmahat and M & D had committed intentional dishonest acts, which were excluded from coverage under the New England policy. As this Court and the Fifth Circuit pointed out in the *Mmahat* case, the "the FDIC 'was not content to rest its case on whether Mmahat and his firm were guilty of malpractice solely because of improper advice.... Rather, [FDIC] included in its argument and evidentiary presentation to the jury the claim that Mmahat and his firm breached their fiduciary duties *as lawyers* because of actions taken to generate fees.'" 907 F.2d 546, 553 (5th Cir.1990). The Fifth Circuit affirmed this Court's finding of no coverage based upon the dishonest acts exclusion in the policy, stating: "worthy as the cause may be, we will not stretch this insurance policy to help pay the bill." *Id.*

Several months following this Court's denial of coverage, and sometime after the FSLIC had settled all "other" claims against Mmahat and M & D, the FDIC (as successor to the FSLIC) filed this separate suit against Duffy and New England. On December 20, 1989, which was before the New England was afforded the opportunity to file responsive pleadings, the Duffy suit was dismissed *sua sponte* on the basis of *res judicata*. The FDIC appealed both this Court's ruling dismissing the *Duffy* lawsuit and that the New England's policy did not cover any of the judgment against Mmahat and M & D because it excluded coverage of intentional dishonest acts. The Fifth Circuit granted the FDIC's motion to consolidate these appeals. During the pendency of the appeals the *Duffy* suit remained stayed up until May 20, 1992 when the Fifth Circuit reversed this Court's dismissal on the basis of *res judicata*. After the stay of the Duffy proceedings while it was pending writ application to the United States Supreme Court, the New England filed responsive pleadings denying coverage claiming, *inter alia*, that the New England's policy was void *ab initio* for material misrepresentation of the risk in the application for the aforesaid insurance.

There can be no genuine dispute that the answers filed on behalf of the New England in the present case raise both the defense of material misrepresentation of the risk in the application and its coverage defense based upon Insuring Clause I(A)(2)(b)(ii) of the New England policy. The "Stipulated Order Governing Issues for Trial" signed by counsel for the FDIC and the New England and also by this Court relates in no uncertain terms the issues for trial, as follows:

2. New England and FDIC agree to limit the issues for trial to the following:

(a) Whether the New England policy is *void ab initio* and should be rescinded due to misrepresentations or omissions made in the application for coverage.

(b) Whether FDIC's claim in Action No. 89–5957 is not within coverage provided by the policy based upon Insuring Clause I(A)(2)(b)(ii). (New England Exhibit "6")

Now turning to the facts regarding the insurance application at issue, it is undisputed that in November 1985, the law firm of M & D applied to the New England for professional liability insurance coverage. The application on behalf of the Mmahat and Duffy Law Partnership (New England Exhibit "4") was dated November 6, 1985, and signed by Marvin Opotowsky ("Opotowsky") as *partner*. The application was followed by correspondence from Gilsbar to M & D dated December 4, 1985, which was signed by Duffy on December 19, 1985, which correspondence confirmed that there were no changes in the information provided in the application for Lawyers Professional Liability Coverage. (New England Exhibit "4")

The New England contends that the negative answer to the question asked at Section III(E) of application for insurance constitutes a material misrepresentation of the risk. The question posed at Section III(E) of the application follows:

---

5. *Federal Deposit Ins. Corp. v. Mmahat, 960 F.2d* 1325, 1326–27 (5th Cir.1992) (emphasis added).

Is the proposed insured aware of any prior incident, act, error or omission which there is reason to suppose might fall within the scope of the proposed insurance? [6]

The declaration which immediately precedes the signature of the applicant reads as follows:

> The applicant declares that to the best of his knowledge *of all persons to be insured* the statements set forth herein and in any attachments made hereto are true and no material facts have been suppressed or misstated.[7]

There is no question but that the applicant referred to above was the "Mmahat & Duffy Law Partnership" which includes the proposed insured lawyers named in answer to Section I(F) of the application, to wit: John A. Mmahat, Peter E. Duffy, Marvin Opotowsky, Vallerie Oxner, Annabelle Walker, Noel Vargas, and N. Eleanor Graham. The very first line of the application, which immediately precedes Application Item I.A., defines the term "applicant" *unambiguously* as follows: "The word 'applicant' for the purposes of this application means all Lawyers associated with the firm." [8] Opotowsky's deposition testimony regarding the application process was that since it was his understanding that it was essentially the obligation of each partner

to respond to the aforesaid application, there's no doubt that he would have followed his normal practice of disseminating a copy to each partner with instructions to look it over and sign, as he would be sending in the application. It is further undisputed that Opotowsky understood that his signature on the application was a signature on behalf of the firm (i.e., all of its partners named in Section I(F) of the application).[9]

In a transparent attempt to create issues of fact, the FDIC argues the existence of two firms (i.e., M & D the notarial firm and MDOW the non-notarial firm) creates a material issue of fact. In essence the FDIC's argument is that Opotowsky filled out the 11/6/85 application for coverage on behalf of the non-notarial firm MDOW and not M & D. Even if this Court were to accept the argument of the FDIC that the coverage sought *via* the application for insurance was only for the non-notarial firm MDOW, then the Court would be constrained to find that the New England's policy covers only MDOW, and thus, there would be no virile share liability for any partner of M & D and no material issue of fact remaining for trial on the merits.[10]

The applications at issue further provide that the statements and particulars contained

**6.** Application for Lawyers Professional Liability Insurance, dated 11/6/85, and signed by Marvin Opotowsky. (New England Exhibit "4").

**7.** *Id.* (emphasis added).

**8.** *Id.*

**9.** See Deposition of Marvin Opotowsky, taken August 28, 1993, at p. 196. (New England Exhibit "5").

**10.** The FDIC points to the fact that on the 11/6/85 application for insurance, the date of commencement of business was listed as 1984, which was the year MDOW the non-notarial firm commenced business. Yet, the application clearly states that the "Mmahat & Duffy Law Partnership" as the name of the applicant and further lists previous continuous coverage for the firm dating from 10/1/85 all the way back to 10/1/78, which was long before MDOW came into existence in 1984. Most apparently this application for coverage was for M & D, not just MDOW. See Gilsbar's Working File (New England Exhibit "A"). Moreover, the policy issued to Mmahat & Duffy as the named insured. See Declarations, Lawyers Professional Liability Policy, indicating "Mmahat & Duffy" as the "Named Insured" in Item 1. Were this Court to hold the

FDIC to its contention concocted solely for purposes of defeating summary judgment that the coverage sought *via* the application was only for the non-notarial firm MDOW then summary judgment would be warranted dismissing the FDIC claim seeking Duffy's virile share of liability adjudged in the *Mmahat* case. This is so, because following the FDIC's argument to its only logical conclusion, coverage was issued to MDOW and not to M & D. The position the FDIC takes in opposing New England's Motion for Summary Judgment is diametrically opposed to the allegations of its complaint to the effect that the policy was issued to M & D, a necessary predicate to virile share liability herein. Here, the Court notes that both the preliminary draft of the application signed by Peter Duffy on 10/17/85 and the final draft of the application signed by Marvin Opotowsky on 11/7/85, failed to disclose any prior incident, act, error or omission which might fall within the scope of the proposed insurance by answering the question at Section III(E) of the application in the negative. So it matters not which application the Court considers for the purposes of construing coverage because the result of the case would be the same, i.e., no virile share liability on behalf of the New England. To make the Court's rationale perfectly clear for any reviewing Court, accepting as true the argument

therein would be relied upon in the event that a policy was issued. (New England Exhibits "4" and "A").

Now turning to New England's policy which issued to "Mmahat & Duffy" on January 20, 1986, Section I entitled INSURING CLAUSES at subparagraph I(A)(2)(b)(ii) extends coverage to prior acts (i.e., coverage for acts occurring prior to the policy period) only if prior to the inception date of the policy, "the firm's management committee or governing body, howsoever designated, or any member thereof designated in the application, had no reasonable basis to believe that *any* Insured had breached a professional duty." (New England Exhibit "4"). It is not disputed that Mmahat, a partner of M & D, was a member the management or governing body of that firm.[11] It is further undisputed that Mmahat was a partner designated in the application for coverage.

Section II(D) at page 3 of the policy defines insured for purposes of "Coverage 1–Professional Liability" as meaning both the Named Insured (i.e., Mmahat & Duffy), plus any employee, partner, officer, director, etc. of the firm. Section II(D) which defines the term "insured" and Section II(E) which defines the term "Named Insured" do *not* provide a "severability of interests" clause.[12] More simply stated, the policy does not provide a separate contract for each assured or the continued coverage of one assured despite the actions of another.

Section VII entitled CONDITIONS at subparagraph A states in no under certain terms that:

A—**Application:** By acceptance of this policy, the Insured agrees that the statements in the attached application are

of the FDIC that the Opotowsky application controls and that coverage was applied for on behalf of MDOW only, then no coverage issued to M & D at all. Simply stated, the FDIC has failed to designate specific facts *establishing a genuine issue of fact for trial on the merits.*

11. Marvin Opotowsky testified in deposition that at the pertinent time the management committee of the Mmahat and Duffy law firm (whether M & D or MDOW) consisted of the partners. Opotowsky Deposition, at pp. 189–90. (New England Exhibit "5"). Peter Duffy testified as to M & D that he and Mmahat, the two partners, were the governing body. Duffy Deposition at pp. 18–19.

12. A typical severability clause would provide that the insurance afforded applies separately to each insured against whom a claim is made or suit is brought, except with respect to the limits of liability. No such "severability of interests" provision modifies the meaning of term "insured" or "named insured" as defined in Coverage 1—*Professional Liability* of the New England Policy. More simply stated the New England policy's professional liability coverage is *not* severable as to the individual insureds and does *not* suggest that coverage applies separately as to Duffy, as a partner of M & D. The Court here notes that the Fifth Circuit in *FDIC v. Mmahat,* 960 F.2d at 1130 n. 10, states that "the New England is not an identical party in *Duffy* because the insurance policy provides separate coverage for Duffy as a partner of M & D." While the statement appears on its face to be at odds with this Court's opinion on the severability of the professional liability coverage at issue, since severability within the context of the New England's policy provisions was not briefed to the Fifth Circuit, and the precise provisions of the

New England's Professional Liability coverage were not discussed at all within the context of the Fifth Circuit's opinion, this Court believes that *the whether the professional liability coverage applies "separately" to Duffy or is "severable"* both being terms of art in the insurance world, remains unaddressed by the Fifth Circuit. This Court is of the opinion that Fifth Circuit's use of the word "separate" was meant only to denote that the policy provided professional liability coverage to Duffy as partner, along with coverage to Mmahat and M & D, leaving the technical question of "severability of interests" and/or whether the policy applied separately to each insured for this Court's determination. The New England Policy provides a number of different types of coverages, to wit: (1) Coverage 1—Professional Liability; (2) Coverage 2—Business Property and Related Coverages; (3) Coverage 3—Employee Dishonesty; (4) Coverage 4—Comprehensive Liability; and (5) Coverage 5—Non–Owned/Hired Automobile Liability Coverage. M & D contracted only for Professional Liability Coverage. The Court here notes that for the purposes of Coverage 4—Comprehensive Liability Coverage, the definition of the term "insured" contains the typical "severability of interests" provision, to wit: "Insured: Meaning any person or organization qualifying as an Insured in the 'persons insured' provision of the applicable insurance coverage. *The insurance afforded applies separate to each Insured against whom a claim is made or suit is brought, except with respect to the limits of the Company's liability.*" (emphasis supplied) The undisputed fact that no such severability clause is provided in Coverage 1 (i.e., Professional Liability Coverage) leads to the inescapable conclusion that such coverage is not severable and should not be applied separately to each insured.

personal representations, that they shall be deemed material and that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between the Insured and the Company, or any of its agents, relating to this insurance.[13]

Finally, the policy by its terms proscribes waiver/change of the insuring terms/rights under the policy, except by written endorsement signed by the Company and issued to form a part of the policy.[14] It is undisputed that no written endorsement waiving and/or changing the insuring provisions of the policy issued.

The New England policy, issued on January 20, 1986 provided coverage for the period of 10/1/85 through 10/1/86, at which time the policy was non-renewed. The policy contained an extended reporting provision, which allowed claims to be made subsequent to the policy period, without any payment of premium. Despite the above provisions, no disclosure whatsoever was made in the application regarding those matters which were the subject of this Court's opinion in *Mmahat,* supra. The Court here notes that it was only after Gulf Federal was placed in receivership in 1986 and the New England's policy was non-renewed, that the various claims against Gulf Federal's former management and others, including the action against Mmahat and M & D were brought to bear.

## II. ANALYSIS

The bases of New England's motion to dismiss and/or for summary judgment are

that: (1) the professional liability policy issued to M & D for the policy period from 10/1/85 to 10/1/86 is void *ab initio* because of material misrepresentations of the risk; (2) the policy provides no coverage because it falls outside of the scope of prior acts coverage delineated in the INSURING CLAUSES at Section I(A)2(b)(ii); (3) FDIC has no standing to raise "waiver" and waiver is otherwise unavailable as a defense under the undisputed facts and based upon the policy provisions. The Court will address each of these contentions in the order presented numerically above.

### A. New England's policy is void *ab initio.*

■ Louisiana law provides that an insurance policy is void *ab initio* if a material "oral or written misrepresentation or warranty [is] made in the negotiation of an insurance contract, by the insured in his behalf ... [if] the misrepresentation or warranty is made with the intent to deceive" or if it would have affected the insurer's decision whether to proceed with the arrangement or the rate charged.[15] More simply stated, a false statement in an insurance application which materially affects the risk, if made with the intent to deceive, constitutes grounds for denying recovery under the policy.[16]

■ An applicant's misrepresentations are considered to be material misrepresentations so long as they affect the decision of the insurer to undertake the risk.[17] Moreover,

---

**13.** The Declarations page of the policy similarly states at Item 6 that: "It is understood that the statements and declarations made by the insured in the application for insurance are true and that no material facts have been suppressed or misstated and that said application for insurance shall be the basis of this contract with the Company." (New England Exhibit "4").

**14.** Section VII(C) entitled Conditions reads: "Changes: Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Company shall not effect a waiver or a change in any part of the policy or estop the Company from asserting any right under the terms of this policy, nor shall the terms, conditions or limitations of this insurance be waived or changed, except by endorsement signed by the

Company and issued to form a part of this policy." (New England Exhibit "4").

**15.** *Estate of Borer v. Louisiana Health Service & Indemnity Co.,* 398 So.2d 1124, 1125 (La.1981); La.Rev.Stat. § 22:619.

**16.** *Johnson v. Occidental Life Insurance Co.,* 368 So.2d 1032, 1036 (La.1979); *Green v. Pilot Life Insurance Co.,* 450 So.2d 406 (La.App. 3rd Cir. 1984); *Lentz v. Metropolitan Life Insurance Co.,* 428 F.2d 36 (5th Cir.1970); and *Davis v. State Farm Mutual Automobile Insurance Co.,* 415 So.2d 501 (La.App. 1st Cir.1982).

**17.** *Manzella v. Paul Revere Life Insurance Co.,* 872 F.2d 96, 99 (5th Cir.1989) (held that in order for the applicant's misrepresentations to be ma-

because of the difficulties inherent in proving that a person acted with "intent to deceive", strict proof of fraud is not required under Louisiana law.[18]  However, intent to deceive poses no difficulty in the case at bar, considering the specific findings of fraud in the *Mmahat* judgment, which also comprise the law of this case wherein the FDIC which seeks to recover Duffy's virile share of that $35 million judgment.

> The intent to deceive must be determined from the attending circumstances which indicates the insured's knowledge of the falsity of the representations made in the application and his recognition of the materiality thereof, or from circumstances which create a reasonable assumption that the insured recognized the materiality of the misrepresentations.[19]

■ New England contends that because its policy provides that the statements made in the attached application are deemed material and the policy issued in reliance upon the truth of such representations [20], proof of the materiality element of the defense is deemed satisfied.  The Court finds it unnecessary to reach that issue because it has no hesitancy under the undisputed facts in concluding that the misrepresentation regarding prior acts in the application for coverage by and on behalf of the partners of M & D was material to the risk, was false, and was made with intent to deceive for the purpose of securing insurance coverage.  The Court is further of the opinion that based upon the undisputed facts, no reasonable trier of fact could conclude otherwise.

■ This is so, for the following reasons. The FDIC's pending action against the New England seeks to recover for Duffy's liability (i.e., virile share) on a $35 million dollar partnership debt.  The findings of intentional dishonest acts in the final judgment of the *Mmahat* case are binding upon the FDIC, so as to preclude it from relitigating issues resolved by that judgment.  The doctrine of judicial estoppel precludes a party in a legal proceeding from asserting a position contrary to a position taken by that party in a prior proceeding.[21]

There can be no doubt that the FDIC prevailed in the prior *Mmahat* proceeding and that this Court made a factual finding of intentional dishonest acts on the part of Mmahat and M & D in the context of that proceeding.[22]  Moreover, the Fifth Circuit's opinion in *Mmahat* reversing this Court's dismissal of the instant proceeding against Duffy and the New England on the basis of *res judicata* rests in part for its validity on the premise that the FDIC would not seek to relitigate its malpractice/breach of fiduciary duty claims (i.e., liability) herein.  In *FDIC v. Mmahat*, the Fifth Circuit explained:

> *Duffy* does not rest on an identical obligation, nor does it require readjudication of the malpractice claim. . . .  Obviously, res judicata would bar *Duffy* if the FSLIC had lost in *Mmahat* **because the FDIC**

---

18.  See *Johnson*, 368 So.2d at 1036.

19.  *Johnson*, supra, at 1036; *Lincoln Nat'l Life Insurance Co. v. McCullough*, 621 So.2d 204, 205 (La.App. 3rd Cir.1993); *Gulf Wide Towing, Inc. v. Associated Insurance Managers, Inc.*, 563 So.2d 432, 437 (La.App. 1st Cir.1990), *cert. denied*, 567 So.2d 107 (La.1990).

terial, it is not necessary that they increase the underwriting risk involved so long as they affect the decision of the insurer to issue the policy). See also, *Overturf v. Aero Insurance Agency, Inc.*, 686 F.2d 350, 353 (5th Cir.1982) (stating " 'materiality,' in this context, 'means that the statement must have been of the nature that, had it been true, the insurer would not have contracted or would have contracted only under a higher premium rate.' ").

20.  New England Policy, Section VII, Conditions, (A)—Application.  (New England Exhibit "4").

21.  In *Zapata Gulf Marine Corp. v. Puerto Rico Maritime Shipping Authority*, 731 F.Supp. 747, 749 (E.D.La.1990) (citing *Moore v. United Services Automobile Association*, 808 F.2d 1147, 1153 n. 6 (5th Cir.1987)), the court explained:

> The doctrine of judicial estoppel precludes a party in a legal proceeding from asserting a position that is contrary to a position taken by that party in the same or prior proceeding. The doctrine is used to avoid damage to the integrity of the judicial process from the perception of inconsistent results.  *Id.*

22.  See supra notes 2, 3 and 4 and accompanying text.

would be seeking to relitigate the issue of liability.[23]

It would be most unusual if not unprecedented for a court to find that a person did not have actual knowledge of his own intentional dishonest acts. The law of this case is that Mmahat, an insured under the New England policy, prior to the application for professional liability coverage in November of 1985 committed *intentional* dishonest acts from which both he and M & D benefitted. This Court's prior findings of fact in *Mmahat* case lead to but one reasonable conclusion, that John Mmahat had knowledge of these prior "dishonest" acts, and thus, it was falsely represented in the application that the applicant (i.e., which by definition included all Lawyers associated with the firm) were not aware of any prior incident which there is a reason to suppose might fall within the scope of the proposed insurance (i.e., professional liability coverage).

This Court's prior finding of *intentional* dishonest acts perpetrated by Mmahat and M & D all of which occurred prior to the subject application for professional liability insurance coverage which included only *to a limited extent* "prior acts coverage" admits but one reasonable conclusion, i.e., that the misrepresentation was material to the risk. No doubt, had the question regarding prior acts been answered candidly, at the very least a higher premium would have been charged. Intentional dishonest acts which caused $35 million in damage unquestionably were material to the underwriting risk.

Finally, considering this Court's prior finding of *intentional* dishonest acts any finding other than that there was an intent deceive would constitute a non-sequitur. There is no question but that Mmahat had actual knowledge of his intentionally dishonest activities and the omission of any mention of such in the application leads to no other reasonable conclusion but that the material false statement in the application for insurance was made by the applicant with the intent to deceive.

■ The clear wording of La.Rev.Stat. 22:619 requires the Court to void the entire policy based upon misrepresentations made by an insured *or in his behalf.* In *Mazur v. Gaudet,* 826 F.Supp. 188, 193 (E.D.La.1992), Judge Clement addressed the issue of whether under Louisiana law material misrepresentations of the risk made in the application by one of several insureds with the intent to deceive voids the policy as to all of the insureds and answered it in the affirmative. The *Mazur* court noted the "prevailing rule" that the entire policy would be rescinded as to all insureds, even though not all were involved in the misrepresentation.[24] As in *Mazur,* the coverage at issue in the present case is not severable and should not be applied separately as to each insured since the policy contains no severability clause.

In *Mazur,* the trustees of a fund sought liability insurance from ULICO. The material misrepresentation in the *Mazur* case was the Trustees Matherne and Gaudet negative response to the following question:

Is the trust fund or any of the trustees aware of any circumstances which may result in any claim being made against the trust fund or any of the present or past trustees for errors or omissions?[25]

Prior to the trustees' application for coverage Gaudet had been embezzling funds and he later pled guilty to embezzling over $2.5 million. Suit was brought by the aforesaid Funds against their former trustees and their insurers, including ULICO, to recover the amounts embezzled. ULICO raised as an affirmative defense material misrepresentation of the risk in the application for coverage and other coverage defenses. Granting summary judgment in favor of ULICO, the *Mazur* court explained:

The appropriate question here is whether the parties would have agreed to an insurance contract for the "innocent" trust-

---

**23.** *FDIC v. Mmahat,* 960 F.2d 1325, 1329–30 (5th Cir.1992) (emphasis added).

**24.** *Mazur v. Gaudet,* 826 F.Supp. 188, 194 (E.D.La.1992) (citing *Bird v. Penn Central Co.,* 334 F.Supp. 255, 260–62 (E.D.Pa.1971); *Shapiro v. American Home Assur. Co.,* 584 F.Supp. 1245 (D.Mass.1984); and *INA Underwriters Insurance Co. v. D.H. Forde & Co.,* 630 F.Supp. 76, 77 (W.D.N.Y.1985)).

**25.** *Id.* at 193.

ees had Gaudet been honest on the application. Because of joint and several liability under ERISA this inquiry is similar to the analysis under La.R.S. § 22:619, of whether ULICO would have proceeded even if it knew of Gaudet's embezzlements. Again, a rational fact-finder could not find that ULICO would have proceeded to insure even the "innocent" trustees on the same terms had it known of Gaudet's defalcations. Thus, the illegal portion of the contract cannot be neatly separated from the legitimate portion. The contract is not severable.[26]

This Court finds the present case indistinguishable from *Mazur*, supra. Here as in *Mazur*, the insurance contract contains no severability of interests provision. In the case at bar Mmahat, the majority owner of M & D, engaged in intentionally dishonest activities in order to generate loan closing fees for M & D. There is no question but that M & D and its partners including Duffy benefitted from the aforesaid intentional dishonest acts. All of these acts pre-dated the application for insurance coverage with the New England.

Counsel for New England aptly points out that the fact that Mmahat did not physically sign the application, or that not all of the named insureds possessed knowledge of the misrepresentations is immaterial. It is undisputed that both Peter Duffy and Marvin Opotowsky signed the preliminary and final applications, respectively, on behalf of *all* of their partners. Mmahat, unquestionably an applicant, within the unambiguous definition of that term "applicant" in the application, necessarily had knowledge of his *intentional* dishonest acts pre-dating the application for professional liability coverage.

Under Louisiana Civil Code article 2814, a partner is a mandatory of the partnership for all matters within the ordinary course of business. Louisiana law is clearly to the effect that the bedrock of partnership liability is the agency principles. In *McCaskill v. Welch*, 463 So.2d 942, 949 (La.App. 3rd Cir. 1985) one Louisiana appellate court analogized as follows:

The liability of one partner for the tortious action of another partner is analogous to the liability of a principal for acts of his agent, since each partner acts both as principal and agent of the other as to acts done within the apparent scope of the business and purpose of the partnership and for its benefit. *Id.* (citing 68 C.J.S. 616, 617).

Thus, agency principles are relevant to determine whether the knowledge of one partner or the firm is imputed to all partners. The New England's application form clearly asked about knowledge of *all* proposed insureds concerning facts which might give rise to a claim under the policy.

B.  The insuring agreement does not provide coverage for claims arising from Mmahat's intentional acts pre-dating issuance of the policy, since Mmahat, a member of M & D's governing body, unquestionably knew about his own intentional acts and had reason to believe that his own acts might give rise to claim prior to issuance of the New England's policy.

Notwithstanding this Court's opinion that the policy is void *ab initio*, the Court will further the address New England's alternative contention that the present claim against Duffy falls outside of the scope of the policy's coverage. The policy does not provide coverage for Mmahat's prior intentional dishonest acts, since Mmahat, a member of the governing body, had reason to believe such acts might give rise to a claim under the policy. The subject policy is a "claims-made" professional liability policy which unambiguously limits coverage for acts errors and omissions which occur prior to the policy period. The policy covers "prior acts" only if the firm's management committee or governing body, or any member thereof, had no reasonable basis to believe that any insured breached a professional duty.[27]

The issue before the Court relates to the scope of the coverage under New England's policy. Insuring Clause I(A)(2)(b)(ii) of the New England policy contains one of the conditions of coverage which the insured must

---

26.  *Id.* at 195.

27.  See New England Professional Liability Policy, Insuring Clause I(A)(2)(b)(ii). (New England Exhibit "4").

satisfy, and which the FDIC has the burden of proving in this case, before it is entitled to indemnification. Simply stated, the policy provision in question is patently a limitation on coverage.[28] It defines coverage for a "claims made" policy.

Section I(A)(2)(b)(ii) is not limited to statements made in the application for coverage. It provides errors and omissions coverage for acts which happen prior to the policy period,

> provided that prior to the inception date of this policy ..., (ii) the firm's management committee or governing body, howsoever designated, or any member thereof designated in the application, had no reasonable basis to believe that any insured breached a professional duty; ....

This clause protects the insurer, in this case the New England, from a form of fraud that consists of taking out "claims made" insurance after an insured has reason to believe that a claim will be made against him. Intent to deceive is not a consideration because the aforesaid policy provision is most aptly characterized as a limitation on coverage and not a warranty or representation which would invoke the dictates of La.R.S. § 22:619.

The Fifth Circuit in *Professional Managers, Inc. v. Fawer, Brian, Hardy, & Zatzkis,* 799 F.2d 218, 224 (5th Cir.1986) construed a similar provision in a "claims-made" policy. Finding the provision unambiguous and that Louisiana courts have enforced policies issued with "claims-made" coverage, the court rejected the insured's argument characterizing the coverage provision as a "warranty" or "representation." [29]

Here, as in *Professional Managers,* supra, the claim New England raises is not that the policy is entirely void due to misrepresentations, but that the FDIC's claim against Duffy would not be covered even if the policy remains enforceable.[30]

Based upon the undisputed fact that Mmahat was a member of the governing body/management committee of both M & D and MDOW, and that Mmahat necessarily had knowledge [31] of his own intentional dishonest acts/breaches of fiduciary duty, which formed the basis of the FDIC's $35 million judgment in the *Mmahat* case, the FDIC's claim for conduct perpetrated prior to inception of the policy, is not covered *by the terms*

---

**28.** *Professional Managers v. Fawer, Brian, Hardy, & Zatzkis,* 799 F.2d 218, 224–25 (5th Cir.1986); *Enserch Corp. v. Shand Morahan & Co.,* 952 F.2d 1485, 1498 (5th Cir.1992).

**29.** In *Professional Managers,* the Fawer firm contended that the questioned provision was best characterized as an insurer's demand for warranty or representation by the insured that no circumstances indicating imminence of a claim are known to the insured at the time that he applied for the policy. Further in this vein, the Fawer firm argued that because La.R.S. § 22:619(A) makes warranties or representations by the insured a ground for voiding a policy only if made with the "intent to deceive", summary judgment was inappropriate since no intent to deceive was shown.

**30.** See also *Stream v. Aetna Casualty & Surety Co.,* 608 So.2d 260, 262–63 (La.App. 3rd Cir. 1992). In *Stream,* the Louisiana appellate court followed the reasoning of the *Professional Managers* case. It was an undisputed fact that the Carmouche firm failed to disclose the existence of a federal suit or potential liability arising therefrom and thus, the court could conceive of no reason why the exclusion from coverage should not be upheld. By its terms the A.L.A.S. policy at issue excluded coverage of claims and

circumstances which occurred before the policy took effect which were known by the applicant and required to be disclosed. The court pointed out that its review of the jurisprudence revealed the distinction between La.R.S. § 22:619 and policy exclusions (i.e., limitations on coverage) was valid. Affirming summary judgment in favor of the A.L.A.S., the professional liability insurer, the Court concluded that there was no need to prove intent to deceive. *Id.*

**31.** The determination of what constitutes knowledge is generally considered a question of fact that might be resolved differently by different triers of fact. However here it cannot be said that Mmahat may not have understood the significance of his "intentionally dishonest activities." It cannot be seriously contended that prior to the inception of coverage Mmahat, an insured under New England's policy and a member of the management committee, had no reasonable basis to believe that he had breached a professional duty. With regard to the extent of Mmahat's "knowledge", under the clear wording of the policy's insuring provision, it is not necessary to prove that suit had been filed or a claim had been made to defeat coverage. A party is only entitled to defeat summary judgment if there is evidence reasonably affording an inference that would sustain its position.

*of the New England's policy* [32] regardless of whose virile share the FDIC seeks to recover. A simple denial of coverage in its answer to the FDIC's complaint raises the issues inherent in the New England's defense pursuant to the insuring provisions of its policy. Since the policy does not cover the asserted liability of Mmahat, Duffy or the law firm M & D, it could not cover the FDIC's potential claim against the New England under the Louisiana Direct Action Statute, La.R.S. § 22:655.[33]

It is this Court's opinion that the intentionally dishonest conduct previously adjudged in the *Mmahat* proceeding far exceeds the degree of knowledge which is required to show that a member of the firm's governing body had a "reasonable basis to believe a professional duty had been breached." In this vein, this Court need only look to the terms of the policy, because the issue here relates to the scope of the coverage afforded. The FDIC presented its case in the *Mmahat* trial, and is bound by the Court's determinations therein as to liability. This Court's decisions regarding the conduct of Mmahat and M & D are clear and unequivocal, and as aptly stated by the New England in its reply brief:

> [I]t is beyond peradventure that Mr. Mmahat as a sophisticated lawyer knew the consequences of his actions, and the possible effect they would have on claims brought against him, his firm and his insurance company.[34]

**C. Waiver.**

**(1) The FDIC Lacks Standing to Raise Waiver.**

■ Speaking of standing, the Court here preliminarily notes that the it is the New England, i.e., Duffy's alleged insurer, who stands in the shoes of Duffy and *not* the FDIC. Bearing that in mind, and further considering that the FDIC is not a party to the insurance contract at issue, either literally or by virtue of "standing in the shoes" of any party thereto, the Court is convinced that the FDIC does not have standing to raise the issues of either "waiver" or "estoppel",

> "[s]ince only parties to the contract of insurance, or their privities, can claim the benefit of waiver or estoppel, parties who are strangers to the contract and not named therein as the insured have been held not entitled to assert, or claim the benefit of, waiver or estoppel against the insurance company so as to extend coverage of the policy to include their interests. . . ." [35]

Lest there be any mistake, this Court in its prior ruling on the discoverability of the New England's entire claims file, did not decide or even broach the issue of standing of a third party to raise the defense of waiver. The Court made it clear to the parties that the inquiry on discovery is not whether the information sought is relevant or admissible at trial. The thrust of this Court's ruling on the FDIC's Motion to Review the Ruling of the Magistrate was that the discovery rules were broad enough to permit discovery of the requested documents even if the information was later held to be inadmissable or irrelevant.

While no Louisiana court has specifically addressed the question of the standing of a third party to an insurance contract to raise the defense of waiver and/or estoppel, there is no question but that Louisiana jurisprudence has uniformly limited rights under an

---

**32.** Here the Court notes that the application is wholly irrelevant with regard to the issue of coverage as it relates to the prior acts provision of the policy. There is no question but that all concerned including Mmahat and Duffy were aware that both M & D and MDOW were to be covered under the same policy. The Court here reiterates that the FDIC cannot defeat summary judgment without identifying specific facts which create issues for trial. More simply stated if this Court were to accept as true the FDIC's contention regarding the distinction between the governing bodies of M & D and MDOW, then coverage issued solely in favor of MDOW and the New England would be entitled to a judgment in its favor dismissing the FDIC's claims short of trial on the merits.

**33.** *Professional Managers, Inc.,* 799 F.2d 218, 225 (5th Cir.1986).

**34.** See, New England's Reply Brief, at p. 19.

**35.** 46 C.J.S. Sec. 788 (1993) (citations omitted).

insurance contract strictly to those who were parties to it.

In the case at bar the New England's misrepresentation defenses of avoidance of the policy and no coverage for prior acts by the policies terms are based upon its alleged insureds' *breach prior to the issuance of the policy,* and without question, prior to the filing of the FDIC's suit against Duffy.

■ The court's decision in *New Zealand Ins. Co. v. Holloway,* 123 F.Supp. 642, 648 (W.D.La.1954) and the clear wording of the Louisiana's Direct Action Statute support this Court's opinion that under Louisiana law a third party to the insurance contract does not have standing to raise the defense of waiver where the insured's breach preceded issuance of the policy. In the *New Zealand* case the defendant contended that the injured parties' claim against the insurance company under the direct action statute is not to be prejudiced by any misrepresentation or equities existing between the insured and the insurer. *Id.* The *New Zealand* court disagreed and explained:

> Section 655 of Title 22 of LSA–Revised Statutes (as amended) grants a direct right of action against the assured and the insurer to third persons injured by the negligent operation of automobiles. This right against the insurer crystallized at the moment of the accident and cannot be prejudiced by the insured's subsequent breach of policy, but where the policy breach occurred here before the accident, ..., cancellation may be obtained by the insurer, and in such cases the rights of third parties under the voided policies are lost. *Id.*

Simply stated, the court recognized that actions under Louisiana's Direct Action Statute are "subject to all lawful conditions of the policy ... and the defenses which could be urged by the insurer." La.Rev.Stat. § 22:655.

As the New England aptly points out in its reply brief, the clear import of *New Zealand* and Louisiana jurisprudence on R.S. 22:655 is that although in limited situations subsequent *post-claim* breaches of the policy such as failure to give proper notice and failure to

cooperate by the insured, cannot prejudice the rights of an injured third party, whereas here the breach occurs prior to the issuance of the policy and a claim being made, third party standing is absent. The New England's misrepresentation defense and policy defense of no coverage of prior acts involves a breach prior to the inception of the policy and a claim being made.

The Court finds the Louisiana case of *Harrelson v. Louisiana Pacific Corp.,* 434 So.2d 479 (La.App. 2nd Cir.1983) instructive. Harrelson filed suit for workers' compensation benefits his former employer. Harrelson's former employer, Louisiana Pacific Corporation (LPC), argued that since the plaintiff had waived compensation coverage *vis a vis* his personal insurer, Rockwood Insurance Company (RIC), this waiver should also be available to LPC (i.e., a third party to the insurance contract between the plaintiff and RIC). In *Harrelson,* LPC filed a third party demand against RIC, plaintiff's insurer. In rejecting the LPC's argument that it should be able to avail itself of this waiver, the court explained:

> This contention is contrary to the fundamental obligations principles.... A contract constitutes the law between the parties.... "Those only are parties to a contract, who have given their consent to it either expressly or by implication." Louisiana Pacific was not a party to the contract between the plaintiff and Rockwood, either expressly or implicitly, and therefore the effects of that contract do not extend to Louisiana Pacific. Furthermore, the contract between Rockwood and plaintiff cannot be properly viewed as a stipulation pour autrui under LSA–C.C. Arts. 1890 and 1902 since there was neither an intent nor an attempt on the part of the plaintiff or Rockwood to stipulate an advantage in Louisiana Pacific's favor. *Id.,* at 484 (citations omitted).

Waiver has been defined as "conventional in nature." [36]

The court in *Guillory v. Gulf South Beverages, Inc.,* 506 So.2d 181, 183 (La.App. 5th Cir.1987), similarly rejected the argument

---

**36.** *Comment, Waiver and Estoppel in Louisiana* *Insurance Law,* 22 La.Law Rev. 202, 213 (1961).

that the named insured contracted for the benefit of the injured claimant, a third party to the insurance contract, and thus, the covenant to act in good faith and to deal fairly should run in the third party's favor as well. In *Guillory*, the injured tortfeasor sought damages from the tortfeasor's insurer pursuant to L.R.S. 22:658, which authorizes penalties and attorney's fees for arbitrary refusal to pay a loss under an insurance policy. The *Guillory* court stated that in essence, the third party "seeks to stand in the shoes of an insured." *Id.* at 184. The court refused to "extrapolate, from the statement of general public policy contained in R.S. 22:655, an intent on the part of our legislature to permit a plaintiff (who is not an insured) to enforce statutory rights granted an insured against his insurer...."

One rule which can be distilled from the Louisiana jurisprudence is that an injured party's rights under the direct action statute are *not* coextensive with the insureds. In *Randall v. Lloyd's Underwriters at London*, 602 So.2d 790, 791 (La.App. 4th Cir.1992), the plaintiff Randall had obtained judgment against a tortfeasor for damages and filed a subsequent breach of contract action against the tortfeasor's insurer Lloyds for failure to pay the judgment. The court held that because Randall was not in privity with the insurer, the insurer's exception of no right of action should have been granted with respect to the breach of contract claim. The *Randall* court explained:

> It is a well-accepted principle in Louisiana jurisprudence that, absent a contrary statutory provision, actions ex contractu cannot be maintained against a party by an individual who is not a party thereto. In the instant case, there was no privity of contract between Randall and Lloyd's

which would give rise to a breach of contract claim against Lloyd's. *Id.* at 791 (citations omitted).[37]

Because waiver by an insurer is based upon a breach of contractual duty to its insured, this Court is of the opinion that based upon the foregoing jurisprudence and the clear wording of Louisiana's Direct Action Statute that *only* the insured has standing to raise the defense of waiver. FDIC's direct action against the New England is confined by the "the terms and limits of the policy."[38]

**(2) There was No Knowing Waiver.**

■ The Court is further of opinion that even if this Court were to assume that the FDIC has standing to raise the defense of waiver, it has identified no conduct on the part of the New England which is sufficient to operate as a waiver. The FDIC submits that the handling of other claims by the New England operates as a waiver.

La.R.S. § 22:3046 (effective January 1, 1993), formerly La.R.S. 22:651, provides that the acts of an insurer in administering a claim shall not constitute waiver, including receiving notices of claims, receiving proofs of loss, investigating losses, and engaging in settlement negotiations. Moreover, providing a defense of claims under a full reservation of rights does not operate as a waiver of any rights under an insurance contract.

In this case it is not disputed that the fraud in the application became known to the New England only after the policy was non-renewed and no further premium was charged.[39] The findings of breach of fiduciary duty/intentional dishonest acts were not final until well after expiration of the policy period at issue.[40] Moreover, early on in the

---

**37.** See also *Oliver v. Natchitoches Air Center, Inc.*, 506 So.2d 559, 561 (La.App. 3rd Cir.1987) (holding tort victims do not have a right of action against an underwriter for negligent acts committed by an underwriter to his client).

**38.** La.Rev.Stat. 22:655 reads in pertinent part: "B(1) The injured person ..., shall have a right of direct action against the insurer *within the terms and limits of the policy; ....*" (emphasis supplied).

**39.** The New England policy issued for the period from October 1, 1985 to October 1, 1986. Suit

was not filed against Mmahat until November 21, 1986, after the policy period as set forth in the declarations expired. The New England was not made a party to the *Mmahat* suit until January 20, 1988, when by third amended complaint the FSLIC named New England as an additional defendant.

**40.** A brief recapitulation of the chronology of the pertinent aspects of the prior proceedings follows: the FDIC's complaint against Mmahat and M & D was filed on November 21, 1986; the FDIC named New England as an additional de-

*Mmahat* case, the New England advised Mmahat and M & D that:

> [T]here are allegations which would suggest acts which may not fall within the scope of the policy provided by New England. Under the circumstances, we necessarily reserve our rights and advise that any action taken by New England, its agents, servants, or employees, or designated attorneys in your defense, should not be construed as a waiver by New England of any of its rights, which it may have under the policy, or the right to rely strictly thereon, nor shall it be estopped from relying upon the terms and conditions of the policy.[41]

The handling of the Duffy claim constitutes the only possible evidence which might bear on the issue of waiver, and as previously mentioned, acts of the insurer in handling of the claim do not operate as a waiver. The Louisiana Supreme Court in *Tate v. Charles Aguillard Ins. & Real Estate, Inc.*, 508 So.2d 1371, 1373 (La.1987)[42] defined waiver as the "intentional relinquishment of a known power or privilege." The *Tate* court further held that reliable proof of such knowing and voluntary waiver is necessary and the burden of

producing it, as in the proof of obligations generally, falls upon the party who demands performance. *Id.* at 1375. Thus, the burden of proving waiver in the case at bar falls upon the plaintiff.

New England has denied that it intentionally relinquished any of its policy defenses. It is undisputed that no such intention was ever communicated to its alleged insureds.[43] Opotowsky testified in deposition that any and all settlements were not based upon liability but were rather negotiated on a cost of defense basis. Moreover, both Duffy and Opotowsky have confirmed that no communication was made to them that the New England was waiving any defenses.[44] Moreover, it is undisputed in this case, that the New England has not provided a defense to Duffy, and that in the prior *Mmahat* case, the New England issued a letter which indicated it was fully reserving its rights.

As to its prior acts policy defense on Section I(A)(2)(b)(ii) of its policy, the only proof which this Court considers relevant to issue of waiver of these policy terms would necessarily concern the New England's handling of the Duffy claim and no others. In this

---

fendant by third amended complaint filed on January 20, 1988; the verdict was returned in 1990; the New England asserted the necessary defenses to avoid liability in that action (i.e., the policy's exclusion of dishonest acts from coverage). The instant suit against Duffy was filed in 1989, but was dismissed *sua sponte* by this Court before any answer had been filed. The matter was reinstated and remanded by the Fifth Circuit in May of 1992. This Court stayed the filing of responsive pleadings during the pendency of writ application. As soon as practicable, the New England answered setting forth its coverage defenses including its void policy defense.

**41.** See Correspondence of New England's Administrative Assistant, dated December 31, 1986. (New England Exhibit "14").

**42.** The Louisiana Supreme Court in *Tate* began its analysis by generally stating that waiver was a doctrine "available to an insured" to show that the insurer waived a condition precedent to coverage. The *Tate* court affirmed the appellate decision which found that waiver was not applicable since the policy did not come into existence because of a breach of a condition precedent. The Louisiana Supreme Court rejected the usual analysis of waiver (i.e., defining waiver in terms of conduct so inconsistent with the exercise of the right), and concluded that the best view is

that waiver may apply to any provision under which the insurer knowingly and voluntarily elects to relinquish his right.

**43.** In *Farm Credit Bank v. Fireman's Fund Insurance Co.*, 822 F.Supp. 1251, 1255 (W.D.La.1993), the court found no waiver and explained that the determinative question was "whether the actions of Fireman's Fund 'led the plaintiff to reasonably believe that the insurer would not require compliance with the policy provision.' " The court held that:

> The internal memoranda contain nothing inconsistent with enforcing the time limitations on filing suit. And even if they did, they could not form the basis of waiver because they were never communicated to the plaintiff and thus could not have induced complacency.

**44.** Deposition of Marvin Opotowsky, at p. 131; Deposition of Peter Duffy, at p. 114–116. (New England Exhibits "5" and "9"). Duffy testified that he understood that the New England was reserving its rights under the policy to assert coverage defenses. His deposition testimony was clearly to the effect that the New England gave him no reason to believe that it would forego the full reservation of rights asserted *via* correspondence dated June of 1993.

case, there was clearly no knowing and voluntary waiver of any defenses. Moreover, even though "inconsistent conduct" is no longer the rule after *Tate*, there was no conduct so inconsistent with the right enforce its policy as written as to indicate a clear intention to waive any rights under its provisions. The Duffy suit was filed in 1989 and dismissed *sua sponte*, albeit erroneously, on the basis of *res judicata* and that issue was on appeal until most recently. The FDIC asserted that Duffy was a separate and distinct claim on appeal, and thus, cannot contest that the only relevant conduct of the New England amounting to waiver as to Duffy, are those facts involved in the Duffy proceedings.

In *Monju v. Continental Casualty Co.*, 487 So.2d 729 (La.App. 5th Cir.1986), the court held that even partial payment of the loss does not bar a company from asserting its coverage defenses. In *Monju*, the court wholeheartedly disagreed with the insureds' contention that the trial court erred in failing to hold that Continental was estopped from denying coverage since it paid the first claim, and explained:

> The law of Louisiana holds that equitable estoppel cannot be used to enlarge or extend coverage of an insurance policy beyond that set forth in the insurance agreement. . . .
>
> \*   \*   \*   \*   \*   \*
>
> [E]quitable estoppel arises: " . . . when one by his actions, or by his silence when he ought to speak, induces another to believe

certain facts, and the other relies on these facts to his prejudice." *Id.* at 731–32.[45] In the case at bar there is simply no evidence of any detrimental reliance whatsoever. Neither Mmahat nor any of the partners of M & D ever apprised the New England of the intentional dishonest acts/breaches of professional duty of Mmahat and M & D all of which preceded issuance of the policy. The New England became aware of these prior acts by virtue of the pleadings filed in the *Mmahat* case. It is the final *Mmahat* judgment which forms the basis of this suit/claim against the New England for coverage of Duffy's virile share.

The FDIC is certainly judicially estopped from arguing at cross-purposes with its prior assertion characterizing the instant action as a *separate* claim against Duffy as partner. The raison d'etre of the Fifth Circuit's decision reinstating the instant case against Duffy was that the FDIC's claim herein constitutes a separate claim for his virile share of the $35 million judgment and that the policy provides coverage for Duffy as a partner of M & D.[46] Clearly, the FDIC is judicially estopped from taking the contrary position that *Mmahat* is *res judicata* insofar as waiver is concerned for the purposes of the instant suit against Duffy. The FDIC's argument that waiver can be based upon the circumstances surrounding the *Mmahat* case, particularly when it is undisputed that the New England issued a reservation of rights letter and asserted the coverage defense necessary to avoid liability in that action, is ludicrous.[47]

---

45. See also *Overturf v. Aero Insurance Agency, Inc.*, 686 F.2d 350, 355 (5th Cir.1982). In *Overturf*, the insured contended on appeal that regardless of his misrepresentation to the insurance agent, the failure of the underwriter to rescind or cancel the insurance policy when they discovered the misrepresentation estops it from denying coverage on that basis. The court held under the circumstances that the insurance company was not aware of the plaintiff's misrepresentation as to his pilot status until after payment of his first installment premium and after the accident, information relative to the insured's student employment status came to its attention from a third party doing an investigation of the accident and not from the insured, and that the insurer cannot be estopped from asserting a valid defense of fraud. *Id.* at 355–56.

46. *FDIC v. Mmahat*, 960 F.2d 1325, 1330 n. 10.

47. The Court here must also note having presided over the *Mmahat* trial and being intimately involved in all of the settlement negotiations which took place with reference thereto, it was only counsel for the FDIC who took position the settlement negotiated therein did not contemplate any claim it had against Duffy personally. Considering that the Fifth Circuit agreed with FDIC's contentions that its claims against Duffy were not contemplated by the settlement, it cannot seriously contend in this proceeding that any of the New England's actions with reference to the *Mmahat* proceedings could in any manner or means compromise the New England's defenses *vis a vis* the FDIC's claim herein for Duffy's virile share of the $35 million dollar *Mmahat* Judgment. Moreover, it was not necessary for the New England to assert either its void policy or prior acts defense in the *Mmahat* case because

This Court is now convinced that the New England's handling of the *Mmahat* matter is irrelevant and presents no genuine issue of material fact with regard to the New England's motion for summary judgment in this case. Considering its argument to the Fifth Circuit that *Mmahat* was not *res judicata* as to Duffy and that Duffy constitutes a separate claim, the FDIC cannot now contend that the New England's defense strategy in the *Mmahat* case in any way compromises its ability to assert coverage defenses with respect to the claim against Duffy. However, even if this Court were to consider the New England's actions in the *Mmahat* case relevant to the separate claim for coverage of Duffy's virile share, the New England participated in *Mmahat* under a reservation of rights and was successful in its policy defense in that action. The Court can discern no inconsistency and no intent to waive coverage defenses asserted herein from the prosecution, defense or conclusion of the *Mmahat* case. Waiver is, after all, the *intentional* relinquishment of a *known* right.

Here it is noteworthy that in the prior *Mmahat* proceedings, the New England did not actively seek to show that its insureds, Mmahat and M & D, were dishonest, but did deny coverage in the event that the FDIC prevailed in its assertion of dishonesty. Inasmuch as fraud can not be presumed, and must be established by clear and convincing evidence, which was not adduced until the trial of the *Mmahat* case, the New England did not have grounds and/or knowledge of all of the pertinent facts necessary to raise the void policy defense in *Mmahat*. However, the New England did raise the issue in its reservation of rights letter, conducted itself consistently, and now that there has been a final adjudication of dishonesty, seeks to en-force its right in accordance with its reservation.

The Court here reiterates the provision of New England policy at Section VII(C) entitled Conditions which reads as follows: "Changes: Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Company shall not effect a waiver or a change in any part of the policy or estop the Company from asserting any right under the terms of this policy, nor shall the terms, conditions or limitations of this insurance be waived or changed, except by endorsement signed by the Company and issued to form a part of this policy." (New England Exhibit "4"). The "waiver" defense which the FDIC seeks to avail itself of can only be effected by written endorsement to the policy, since it relates to a matter that occurred prior to both the issuance of the policy and any claim being made (i.e., prior acts of which the applicant had knowledge) and it affects a provision of the insuring agreement which forms *the basic insuring provision* of the New England's claims-made policy (i.e., Section I(A)(2)(b)(ii)).

(3) The FDIC Cannot Urge the Estoppel or Waiver So As To Make the Insured's Fraud Effective.

██ The FDIC suggests *contra* the weight of authorities, that the defense of waiver it seeks to invoke is somehow absolute and not limited. However, it is elementary that one who is guilty of fraud cannot urge estoppel [or waiver] against the other party to the contract for the purpose of making his fraud effective.[48] According to the Fifth Circuit in *Schrader v. Prudential Ins. Co.*, 280 F.2d 355, 364 (5th Cir.1960):

Waiver and estoppel apply when the insured is deceived or misled to his detriment, not when an insured invokes waiver

---

the dishonest acts exclusion presented the perfect foil based upon the evidence adduced at the *Mmahat* trial by the FDIC upon which this Court premised its finding of intentional dishonest acts. The FDIC challenged this Court's finding of dishonesty as to the firm M & D. In addressing the FDIC's argument on appeal, the Fifth Circuit refused to let the FDIC undo what it had wrought by including in its argument and evidentiary presentation to the jury the claim that Mmahat *and his firm* breached their fiduciary

duties. as lawyers because of actions taken to generate fees. 907 F.2d at 553.

48. *New York Life Ins. Co. v. Odom*, 93 F.2d 641, 644 (5th Cir.1937); *McDaniel v. United States*, 196 F.2d 291, 294 (5th Cir.1952) (citing the *Odom* case for the proposition that "it is elementary that one who is guilty of fraud cannot urge estoppel [or waiver] against the other party to the contract for the purpose of making his fraud effective.").

and estoppel in order to make his fraud effective.

The New England aptly points out that the only Louisiana cases which have resulted in a finding waiver involved the factual circumstance that the insurer knew of the fraud before the issuance of the coverage, but issued the coverage despite such knowledge.[49] Essentially, in those cases there was no fraud because the insured had knowledge of the allegedly concealed facts prior to issuing coverage of accepting a premium payment.

That was precisely the case in the Fifth Circuit's most recent decision in *Home Insurance Company v. Matthews*, 998 F.2d 305, 311 (5th Cir.1993). The precise holding of the court in *Matthews* was that because the insurer had reason to believe that its insured had misrepresented his knowledge of possible claims (i.e., sixteen supplemental claims attached to his renewal application) and despite such knowledge it subsequently accepted renewal premium payments, such action on its part was tantamount to waiver of its right to avoid coverage. Both the *Matthews* case, and the *Swain* decision discussed herein at note 49 essentially involve no fraud. In both cases the insurer had the requisite knowledge prior to extending or issuing coverage.

It is this Court opinion that both *Matthews* and *Swain* are inapposite. In the present case no coverage was issued nor premium charged by the New England *after* discovering fraud in the application. More to the point, it was not until long after the policy period expired when the findings of intentional dishonest acts were made and became the final judgment of the Court.

## CONCLUSION

The FDIC presented its case on liability against Mmahat and M & D in the *Mmahat* trial, and is bound by those determinations. This Court's decision in *Mmahat* regarding the conduct of Mmahat and M & D is clear

and unequivocal. There can be no serious dispute that Mmahat, an experienced lawyer with sophistication commensurate with years of experience practicing before the bar, knew the consequences of his intentional dishonest acts/breach of professional duties, and the effect they would have on the claims-made professional liability coverage which was procured thereafter from the New England to cover claims made against himself, his partners, and his law firm M & D.

The policy is *void ab initio.* The term applicant as it was used throughout the application for insurance was unambiguously defined at the outset to mean "all Lawyers" associated with the firm and the application unambiguously requested responses based upon the knowledge of *all lawyers.* Moreover, the very terms which define the professional liability coverage afforded by the New England, unambiguously limit coverage of prior acts and do not provide coverage for prior acts under the undisputed facts of this case, to wit: Mmahat, unquestionably a member of the governing body of M & D and an insured under the policy, had reason a reasonable basis to believe that he had breached a professional duty prior to the policy's issuance. On both the basis of New England's void policy and its defense of no coverage of "prior acts", it is entitled to summary judgment dismissing the FDIC's claims in the present case. Because of the FDIC's evidentiary presentation in the *Mmahat* case, it is saddled with the findings of *intentional* dishonest acts/breaches of professional duty pre-dating issuance of coverage as a matter of law. According to the Fifth Circuit's prior ruling in this case, the FDIC is not free to relitigate liability in this case against Duffy for his virile share of the $35 million judgment which issued in the *Mmahat* proceeding.

Additionally, the Court is of the opinion that the FDIC, which is not a contracting party, does not have standing to raise the defense of waiver, particularly, under the

---

49. See, *Swain v. Life Insurance Company of Louisiana,* 537 So.2d 1297, 1301 (La.App. 2nd Cir.), *cert. denied,* 541 So.2d 895 (La.1989) (holding the insurer cannot deny coverage on the basis of a "sound health" provision when its agent had reason to suspect the insured health was dubious, yet accepted the premiums and issued the

policy without requiring the insured to read and fill out the application form). In *Swain,* the defendant presented no evidence of an actual intent to deceive. The evidence was to the effect that the insured was asked no questions about his health, although he was on crutches at the time. *Id.* at 1300.

undisputed facts here, where the net result would be to make the insured's fraud effective as against the defrauded insurance company. Finally, the FDIC has come forward with no evidence to suggest that the New England *voluntarily* and *knowingly* waived its right to assert the policy's limitations on coverage *as to Duffy.* The findings of *intentional* dishonest acts/breach of professional duties, i.e., the guts of the New England's Section I(A)(2)(b)(ii) defense, was not final and thus, not actionable until May of 1992. Although the FDIC filed its suit against Duffy in 1989, it was dismissed *sua sponte* on the basis of *res judicata* and that issue was on appeal until most recently, May 20, 1992 to be exact. The Duffy proceedings were stayed pending resolution of the appeal. Immediately after the Duffy suit was reinstated and remanded the New England urged both its void policy defense and its denial of coverage with respect to the FDIC's claim against Duffy. Even if this Court were to consider the *Mmahat* proceedings relevant with regard to the issue of waiver *vis a vis* the Duffy suit, the FDIC has come forward with no factual basis for finding waiver based upon the New England's conduct in the *Mmahat* proceedings. As previously stated, the New England issued a reservation of rights letter to the insureds stating that coverage was not provided for the allegations made by the FDIC in its complaint in *Mmahat.* Moreover, the deposition testimony of the alleged insured Duffy was to the effect he understood that the New England was reserving its rights under the policy to assert coverage defenses.

Accordingly, and for all of the above and foregoing reasons, the Court is of the opinion that there exist no material issues of fact for trial on the merits, and therefore,

IT IS ORDERED that defendant New England Insurance Company's Motion for Summary Judgment is hereby GRANTED and the FDIC's claims against it are hereby DISMISSED WITH PREJUDICE.

The Clerk of Court is directed to enter judgment in accordance with the foregoing.